Maureen Jaroscak  117677
1440 North Harbor Boulevard
Suite 900
Fullerton, California 92835
(714) 514-1317
maureenjaroscak@gmail.com


Attorneys for Plaintiff,
Ms. Wendy Benge


# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA


WENDY BENGE,

     Plaintiff,

     v.

W HOTEL HOLLYWOOD
MANAGEMENT, INC., a Delaware
Corporation;  HOLLYWOOD HOTEL
OPCO, LLC, a Delaware Limited Liability
Company; ACORE CAPITAL
MORTGAGE, LP, a Delaware Limited
Partnership; HOLLYWOOD & VINE
RESIDENCE ASSOCIATION, a California
Corporation, and DOES 1 through10,
inclusive,

     Defendants.

Case No.


**MS. BENGE'S COMPLAINT FOR
VIOLATION OF THE AMERICANS
WITH DISABILITIES ACT, FEDERAL
HOUSING ACT, UNRUH CIVIL
RIGHTS ACT, AND PREMISES AND
NEGLIGENCE LIABLITY**

**JURY TRIAL DEMANDED**

Plaintiff, Ms. Wendy Benge, complains of Defendants and each of them, and for causes of action, alleges as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1331, 2201, and 2202.  Ms. Benge brings this suit in her First Claim under Title III of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*, and her Second Claim under the Fair Housing Act ("FHA"), 42 U.S.C. 3601 *et. seq.*

2. This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a).  Ms. Benge's Third Claim pursuant to California's Unruh Civil Rights Act, Civil Code § 51, *et seq.*, and Fourth Claim for Premises Liability are related and share a common nucleus of operative facts with her federal Claims such that a plaintiff would ordinarily expect to try them all in one proceeding.  Resolving all claims in a single action serves the interests of judicial economy, convenience, and fairness to the parties.

3. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(c).  Defendants' discrimination and violations of Ms. Benge's rights as a disabled person occurred within the Central District of California.

## PARTIES

4. On March 27, 2022, Plaintiff, Ms. Wendy Benge ("Ms. Benge"), was and now is a resident of the County of Los Angeles, State of California.  Ms. Benge is a known decorated Gulf War veteran who is physically handicapped and disabled within the meaning of the Americans with Disabilities Act ("ADA"), 42 U.S.C. section 12181, the Federal Housing Act ("FHA"), 42 U.S.C. section 3602(h), and 28 C.F.R. section 105(f), having suffered a 70% military disability rating caused by closed head trauma, scarred lungs, and burns during her active duty in the U.S. Navy in 1991.

5. On that date, Defendant W Hotel Hollywood Management, Inc., was and now is a corporation organized under Delaware law, with its principal place of business in Bethesda, Maryland, and acting as the agent, joint venture, and manager with the other Defendants in Los Angeles County for the W Hotel Hollywood and Residence located at 6250 Hollywood

Blvd., Hollywood, CA 90028, built in 2009 as a public accommodation, commercial facility, and covered entity under ADA § 12181; 28 C.F.R. §§ 26.102, and FHA § 3603-04.

6.  On that date, Defendant Hollywood Hotel OpCo, LLC., was and now is a Limited Liability Company organized and existing under Delaware law, with its principal place of business in Honolulu, Hawaii, and engaged in business in Los Angeles County, as the licensee under a license from ACORE Capital Mortgge, LP, as co-manager and joint venturer to operate the W Hollywood Hotel and Residence with the other Defendants as a public accommodation, commercial facility, and covered entity under ADA § 12181; 28 C.F.R. §§ 26.102, and FHA § 3603-04.

7.  On that date, Defendant ACORE Capital Mortgage, LP, was and now is a Limited Partnership organized and existing under Delaware law, with its principal place of business in Larkspur, California, and engaged in business in Los Angeles County, as the Lease holder in possession of the W Hotel and Residences, including where Ms. Benge was injured, the licensor to Hollywood Holtel OpCo, LLC., and the co-manager and joint venturer with the other Defendants as a public accommodation, commercial facility, and covered entity under ADA § 12181; 28 C.F.R. §§ 26.102, and FHA § 3603-04.

8.  On that date, Hollywood & Vine Residence Association was and now is a corporation organized and existing under California law and engaged in business in Los Angeles County as the Homeowners Association owner-operator of the W Hollywood Residences, joint venturer with the other Defendants, and a covered entity under ADA § 12181; 28 C.F.R. §§ 26.102 and 36.104, and FHA § 3603-04.

9.  Pursuant to Local Rule 19.1, Ms. Benge is unaware of the true names and identities of Doe Defendants 1 through 10, inclusive, and therefore sues them by these fictitious names.  Ms. Benge is informed and believes that each Defendant designated as a Doe is legally responsible for the events and happenings described in this Complaint, caused or contributed to Ms. Benge's injuries and damages, or was the agent, representative, or employee of each other Defendant.  When Ms. Benge has ascertained the identities of these fictitious Defendants, Ms. Benge will amend this Complaint to include their identities.

## STATEMENT OF THE CASE

### A.  Ms. Benge's Background

#### 1.  Ms. Benge's military services and 70% disability rating

10.  Ms. Benge served in the U.S. Navy from 1988 to March, 1991, where she was an Airman and Anti-Submarine Warfare Technician for warfare airborne strategic weapons systems at Operational Air Test and Evaluation Squadron One.  She flew in fixed-wing Maritime Patrol Aircraft, including the Lockheed P-3c Orion 2V Neptune and Sikorsky SH-60 Seahawk helicopter to meet national security threats.  While on active duty in an undisclosed and classified location during the Gulf War era in January 1991, Ms. Benge suffered a closed head injury, burned lungs, and other injuries that left her unconscious until she awoke at Bethesda Naval Hospital in Bethesda, Maryland.  She had been exposed to chemical solvent gas that scarred her lungs and skin.  She had permanent disabilities which caused petit-mal seizures, memory loss, migraines, arthritis, learning disabilities, difficulty ambulating, post-traumatic stress disorder ("PTSD"), asthma, retinitis, and scarred lungs.

11.  Ms. Benge's sustained physical and mental impairment and disabilities which have a substantial limitation on one or more of her major life activities and are regarded by the United States as a disability described in 42 U.S.C. §§ 12102(2) & 12132, and 28 C.F.R. section 105(f).  For her services Ms. Benge received a U.S. Commendation Medal from the Secretary of Navy for valor, and a Defense Medal from the U.S. Navy.  Ms. Benge was honorably discharged on March 8, 1991, from the Navy with a 70% disability rating after three and one-half (3½) years on active duty until she sustained her injuries.

#### 2.  Ms. Benge's legal education and activities as an attorney

12.  Following her discharge from the U.S. Navy, Ms. Benge received a Bachelor of Arts degree in Philosophy and Religion from the University of Southern California in 1997 and 1998, where she had a full military disability scholarship.  Ms. Benge was required to attend special disability education programs because of her loss of memory, inability to recall words, and spelling difficulties.  Despite her injuries, Ms. Benge received a Bachelor of Laws Degree from the University of Canterbury in New Zealand in April, 2022.  On May

10, 2002, Ms. Benge was admitted as both a Barrister and Solicitor in New Zealand, and on June 4, 2002 Ms. Benge was admitted as a Legal Practitioner to the Supreme Court of New South Wales, Australia.  Ms. Benge received a Master of Laws Degree from Duke University School of Law in Durham, North Carolina in 2003, where she was awarded the Order of the Coif, was the President of Phi Delta Phi Law Fraternity, head of her class, and served as a member of the Duke University Bar Association.   She was admitted to the California State Bar in 2005.  Ms. Benge studied Philosophy at Edinburgh University in Scotland in 1996, and Project Finance at Hong Kong University of Law in 2001.

13.  Since 2005, Ms. Benge has been engaged in the active practice of law in the television and motion picture industry.  She was in-house Counsel and Vice President of Legal and Business Affairs at Landmark Entertainment in 2005.  She was employed at the law firms of Stroock & Stroock & Lavan LLP in 2007, and Akin Gump Strauss Hauer & Feld LLP in 2010.  Ms. Benge's legal representation ranges from studio productions and independent films to scripted and unscripted television. She provides personal representation to prominent figures and films such as 'Lee Daniels' "The Butler" (2013) starring Forest Whitaker and Oprah Winfrey; "New York, 'I Love You'" (2008) starring Natalie Portman, Bradley Cooper, Orlando Bloom and Blake Lively; "Brothers Bloom" (2008) starring Adrian Brody and Rachel Weisz.  Ms. Benge has produced such films as "Life of Crime" (2013) starring Jennifer Anniston, Isla Fisher and Tim Robbins; "Life After Beth" (2014) starring John C. Reilly; "Walk On" (2013); "Apartment Troubles" (2014) starring Will Forte; "Broken Vows" (2016) starring Wes Bentley, Cam Gigandet and Jaimie Alexander; "The Capture" (2019); "The Talking Tree" (2019); and "Somewhere Slow" (2022), and others.  Ms. Benge founded the production company Bullet Entertainment with offices in Los Angeles and Wellington, New Zealand.

### 3.  Ms. Benge's residence at the W Hotel Residences

14.  In November, 2021, Ms. Benge became a resident in the W Hotel Hollywood Residence.  Ms. Benge chose the W Hotel Residence, which is jointly managed with the Hotel, as her home because when Defendants approved the lease of her unit from a current

owner, Defendants represented in writing they were handicapped accessible and ADA compliant. (Exhibit "A"). Defendants written accessibility policy for the W Hotel also stated the facility was ADA compliant and accessible to handicapped people. (Exhibit "B").

15. When Ms. Benge moved into the facility, she provided Defendants with a May 5, 2021 letter from Dr. Michael Sedrak which qualified Ms. Benge's dog, Bijou, as a service dog (Exhibit "C"). Dr. Sedrak's letter stated and informed Defendants:

> "Ms. Benge has been a patient under my care since 2013. Ms. Benge is a 70% disabled veteran with underlying medical conditions. I am intimately familiar with her medical history and the functional limitations imposed by her disabilities and related disorders. I am requesting and recommending that Ms. Benge receive the medical benefits for her disability and by the ownership of her Service Dog Bijou dela Hound.

> "Ms. Benge meets the definition of disability under the Americans with Disabilities Act, Fair Housing Act and the Rehabilitation Act of 1973 by the continued suffering of petit-mal epilepsy, absent seizures, head trauma and PTSD among other ailments consisting of asthma, scarred lungs and anxiety.

> "Due to symptoms associated with her disability/disorder Ms. Benge has certain limitations that substantially limit one or more major life activities. This includes physiological and psychological disturbances of which having a service dog, around the clock, including housing and her work environment, greatly benefits her life and are a medical necessity."

**B. Ms. Benge's Injuries on March 27, 2022**

**1. The W Hotel and Residence invited Ms. Benge to an Oscars party**

16. On March 27, 2022, Ms. Benge was a resident of the W Hotel and was invited by the W Hotel Residence and Hotel management to attend a live video viewing party in the Hotel lobby of the Academy of Motion Pictures Arts and Sciences 2022 Oscars Awards. Ms. Benge is a Member of the Producers Guild of America. While she was at the event, Defendants provided her with alcoholic beverages. However, Ms. Benge felt safe in consuming alcohol because she was in the W Hotel which was in the same building as her residence. Ms. Benge could access her residence by walking through a Hallway which connected the Hotel lobby to her residence building.

17. Following the Oscars presentation, a Jazz Performance began at the W Bar in the Hotel lobby. While Ms. Benge had a seat during the Oscars presentation, the Hotel

management informed Ms. Benge she would have to give up her seat to other patrons.   Ms. Benge stated to the management she was disabled, had consumed alcohol, and needed a seat. However, the Hotel management refused to provide a seat and required she stand at the Bar when the management and bartender knew she was disabled from previous discussions and prior accommodation requests due to her disability.

18.  Shortly prior to mid-night on March 27, 2022, Ms. Benge walked 30-yards through the Hotel lobby toward the Vine Street side of the building to a door leading to the Hallway access for W Hotel Residents.  Ms. Benge leased an apartment in the W Residence, and the Hallway was the only access to her residence without going outside the building which was dangerous at night.  The doorway displayed a sign which stated "Resident Access Only" and a logo for the "W Hotel & Residences."  There was no sign indicating a mobility ramp or handicapped access, and while Ms. Benge had traversed the Hallway several times in the past, she was unaware of any handicapped ramp in the Hallway because it was concealed by several heavy red blackout curtains which blocked the entrances on the top and bottom of the stairs indicating privacy and no admittance behind the curtained-off areas.

**2.  Ms. Benge fell on the stairs not knowing there was a handicapped ramp**

19.  Ms. Benge entered the Hallway which is located on the west side of the Hotel Lobby and was jointly owned, managed, leased, or operated by each of the Defendants.  Ms. Benge moved toward the stairway leading down from the upper Hotel lobby level to the lower Residence level.  The Hallway was unreasonably dark making it difficult to see, had burnt out lights, uneven steps on the stairway, and carpeting with high warn matting.  The heel of Ms. Benge's shoe caught on the carpeting of the second stairway step and caused Ms. Benge to fall and tumble down the stairs resulting in severe injuries to her shoulder, arms, back, chest, an acute compound fracture of her clavicle, damage to her cervical spine, scapula, neck, left side of her head and arm.  In severe pain, Ms. Benge crawled in the dark hallway to trigger an alarm on the Residence door, and the Residence concierge responded and called an ambulance because Ms. Benge's collar bone was pushing through the skin.

20.  At the hospital, an X-Ray below (Exhibit "D") showed her injury:

MS. BENGE'S COMPLIANT FOR VIOLATION OF THE ADA, FHA, AND UNRUH ACT



21.  Ms. Benge underwent multiple hospitalizations, surgeries, and the insertion of a titanium metal plate with 10 pins.  However, the bones did not heal and left her shoulder and arm hanging by the tendons causing pain and immobility.  Ms. Benge has experienced permanent disability, scaring, and pain as shown by the X-Ray below (Exhibit "E"):



**C.  Defendants Discriminated Against Ms. Benge Based on her Disabilities**

**1.  Defendants knew Ms. Benge had to go through the dangerous Hallway**

22.  Defendants knew Ms. Benge was disabled under ADA, 42 U.S.C. § 12181, *et seq.*; FHA, 42 U.S.C. 3601 *et. seq.*; and the Unruh Act, Civil Code § 51 *et seq.*  Defendants engaged in intentional discrimination against Ms. Benge by concealing the handicapped ramp in the Hallway between the W Hotel and Residences and placing blackout curtains across both ramp entrances.  Defendants blocked access, created inaccessible barriers, misrepresented the Hotel's accessibility, deterred Ms. Benge from visiting the Facility, and failed to place ADA signs and placards in the W Hotel and Residences' entrance and exit.

23.  Defendants owned, maintained, leased, and failed to repair the Hallway, and they failed to warn of the concealed handicapped access ramp which was originally placed in the Hallway because of its known dangerous conditions.  Defendants misrepresented to Ms. Benge, who had to travel through the Hallway to reach her home, that the Facility was handicapped accessible, while they concealed the handicapped ramp.  Defendants failed to warn her of the dangers from the dark Hallway where lights were burned out, the uneven stairway steps, the high mat and worn carpeting and the absence of handicapped signs.

### 2.  Defendants discriminated against Ms. Benge with a video of her injury

24.  On April 27, 2022, Ms. Benge requested the head of Defendant W Hotel Management to provide her with a copy of the video tape of her fall taken from the closed circuit T.V. in in the Hallway on March 27, 2022.  She needed the video to assist her physicians in diagnosing the nature of her injury.  The Manager refused to provide the video stating Defendants would not permit its release and that if Ms. Benge wanted such video she would need to issue a subpoena.

25.  However, Ms. Benge later learned from other homeowners and staff at the Residence that the video had been released to numerous individuals in an uncontrolled humiliating distribution where individuals had the video on their IPhones and were showing the video to their friends and acquaintances while making humiliating derogatory comments about Ms. Benge, her disabilities, and her injuries.  Defendants' unauthorized video distribution created social opprobrium, an irrational discrimination against her new disability, and shame from the video's display to numerous other individuals.  Defendants engaged in discrimination against Ms. Benge by subjecting her to social stigma, indignity, and mental anguish through the unauthorized distribution of the video.

### FIRST CLAIM

**(Against All Defendants for Denial of Full and Equal Access, Concealment of Handicapped Access, and Failure to Erect Signs in Violation of Title III of the Americans with  Disabilities Act of 1990 42 U.S.C. § 12181, et seq.)**

26.  Ms. Benge refers to paragraphs 1-25, inclusive and incorporates them in this Claim.

A. **Defendants Have Engaged in Willful Violations of the ADA**

    1. **Defendants denied Ms. Benge full and equal access to the Facility**

27.  On July 26, 1990, Congress enacted the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101 et. seq.  Pursuant to Title III, 42 U.S.C. §12181(7), and 28 CFR §36.104, no individual may be discriminated against on the basis of disability with regards to the full and equal access and enjoyment of the goods, services, facilities, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.  The W Hotel and Residence are a place of public accommodation and establishment which provides goods and services to the general public and must comply with the ADA. The Facility is open to the public, its operations affect commerce, and it is a sales establishment.  42 U.S.C. § 12181 (7) and 28 C.F.R. § 36.104.

28.  Defendants are a "place of public accommodation" and a facility operated by a private entity which affects interstate commerce and is: (1) an inn, hotel, motel, or other place of lodging; (2) a restaurant, bar, or other establishment serving food or drink; (3) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment; (4) an auditorium, convention center, lecture hall, or other place of public gathering; (8) a museum, library, gallery, or other place of public display or collection; and (12) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.  ADA, 42 U.S.C. § 12181(7); 28 CFR § 36.104.

29. As a public accommodation, Defendants are governed by ADA Title III which provides that individuals with disabilities may not be "excluded from participation in or be denied the benefits of the services, programs or activities of a public entity," nor may they be "subjected to discrimination by any such entity." 42 U.S.C. § 12181. The obligation to ensure disability nondiscrimination includes an obligation to ensure equal safety. Defendants violated the ADA by failing to provide Ms. Benge with a safe facility and denied equal access to handicapped facilities.  Defendants discriminated against Ms. Benge and others who are similarly situated, by denying access to, and full and equal enjoyment of goods, services, facilities, privileges, advantages and/or accommodations at Defendant's

premises, and improper distribution of the video.

30.  Discrimination also includes a failure to remove architectural barriers in existing facilities where such removal is readily achievable, or where removal of a barrier is not readily achievable, "a failure to make such … facilities… or accommodations available through alternative methods, if such methods are readily achievable." 42 U.S.C. § 12181 (b)(2)(A)(iv) and 42 U.S.C. § 12181 (b)(2)(A)(v).  Defendants violated the ADA by concealing the handicapped entrance to the ramp, failing to remove the obstruction when such removal was readily achievable, failing to have handicapped signs, and failing to act in a manner that could affect the usability of the facility.  Defendants failed to warn, give notice of, and remove architectural barriers pursuant to 42 U.S.C. §12182(b)(2)(A)(iv).

## 2.  Defendants intentionally concealed the Handicapped Access Ramp

31.  Defendants engaged in willful and intentional misrepresentations they were ADA compliant and concealed the handicapped access ramp in the Hallway between the Hotel lobby and Residences.  Defendants placed a blackout curtain across both entrances of the ramp.  Defendants' management, whose offices were located in the Hallway and whose names are within Defendants' exclusive knowledge, had seen Ms. Benge pass through the Hallway on other occasions prior to March 27, 2022, and they knew Ms. Benge would utilize the Hallway on March 27, 2027.  There were no handicapped signs or placards on the Residence or Hotel entrances to the Hallway, and management personnel failed and refused to point out or identify to Ms. Benge the existence of the ramp.

32.  Defendants knew Ms. Benge was handicapped and had a 70% disability rating from the Navy.  Ms. Benge had provided Defendants with a written doctor's report identifying her disability.  Despite knowing of Ms. Benge's handicap and disability, Defendants failed and refused to identify to her the hidden handicapped access ramp.

33.  The Discrimination Defendants have practiced "includes --a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that

making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations."   42 U.S.C. § 12182(b)(2)(ii)

### 3.  Defendants violated the ADA Accessibility Standards

#### a.  Defendants discriminated by the failure to post signs

34.  Pursuant to the mandates of 42 U.S.C. §12134(a), on July 26, 1991, the Department of Justice, Office of the Attorney General, promulgated Federal Regulations to implement the ADA's requirements. The ADA Accessibility guidelines ("ADAAG"), 28 C.F.R. Part 36, may cause violators civil penalties of up to $97,523 for the first violation and greater amounts for subsequent violation.  The Department of Justice (DOJ) and the Department of Transportation (DOT) have issued ADA Accessibility Standards. DOJ's ADA Standards apply to all facilities except public transportation facilities, which are subject to DOT's ADA Standards.  Defendants are required to comply with the ADA Accessibility Standards which apply to places of public accommodation, commercial facilities, and state and local government facilities in new construction, alterations, and additions. The ADA Standards are based on minimum guidelines set by the Access Board.

34.  The Defendants are in violation of 42 U.S.C. §12181 *et. seq*., and 28 C.F.R. 36.302 *et. seq*., and are discriminating against Ms. Benge with the following violations which Ms. Benge personally encountered and has knowledge:

(1)  ADA Standard 201.6 requires that building entrances comply with 404 regarding doorway and gate compliance and shall be identified by the International Symbol of Accessibility complying with 703.7.2.1. Directional signs complying with ADA Standard 703.5 that indicate the location of the nearest entrance complying with 404 shall be provided at entrances that do not comply with ADA Standard 404;

(2)  ADA Standard 206.2.3.1 requires alternate accessibility routes for stairs;

(3)  ADA Standard 206.3 requires the accessibility routes for stairways to be in the same area as the stairway;

(4)  ADA Standard 404.2.3 relating to doorways: "There shall be no projections into the required clear opening width lower than 34 inches (865 mm) above the finish floor

or ground. Projections into the clear opening width between 34 inches (865 mm) and 80 inches (2030 mm) above the finish floor or ground shall not exceed 4 inches (100 mm)."

(5)  ADA Standard 216.4.1 requires there be signs at exit doors, exit passageways, exit discharge, and exit stairways, and the signage comply with 703.1, 703.2, and 703.5 which require with raised characters of 1/32 inch above their background, in uppercase, and accompanied by braille;

(6)  ADA Standard 703.1 states that when signs are required either one sign with both visual and tactile characters be provided, or two separate signs, one with visual, and one with tactile characters, shall be provided;

36. Defendants failed to provide notification to Ms. Benge or signs at the entrance and exit to the building.  Defendants failed to identify the handicapped access ramp in the Hallway or on the doors and passage ways leading to the Hallway.  Defendants' failure to post signs and provide notifications constituted a violation of the ADA.

**b.  Defendants violated the California Building Codes**

37.  In addition to the Department of Justice ADA Accessibility Standards, Defendants' facility was required to meet the standards of the 1998 California Building Codes ("CBC"), (Physical Access Regulations).  The California's Building Standards Codes are found in Title 24 of the California Code of Regulations (CCR), and are designed to comply with the requirements of the Americans with Disabilities Act (ADA) and State statutes.   Defendants violated the following CBC provisions:

(1)  The International Symbol of Accessibility must be displayed at building entrances and in the lobbies of buildings which have been remodeled to provide accessible sanitary facilities. (1998 California Building Code ("CBC") §§ 1114A and 1117A.3;

(2)  All primary and exterior ground-floor exit doors to buildings and facilities shall be made accessible to individuals with disabilities. (CBC § 1120A.1.1.)  Both doors of double doors designated as a public entrance must be kept unlocked during normal business hours. (Health & Saf. Code, § 13011.).  The Hallway leading from the W Hotel to the W Residences constituted a ground-floor exit door.  The exit was not handicapped accessible

because of the lack of signs and concealment of the handicapped access ramp;

(3)  Paths of travel must be accessible. There are also accessibility requirements for ramps; striping for persons with visual impairments; wheel guides; detectable warnings; and door pressure, surfaces and hardware. (CBC  §§ 1102A *et seq*.; 1102B; 1114B.1.2; 1127B.1 *et seq*.; and 1133B.2.5 *et seq*.; Gov. Code, § 4460.).  Defendants violated the CBC requires for accessibility for ramps and detectable warnings.

### c.  The distribution of the video was an irrational discrimination

38.  The distribution of the March 27, 2022, video of Ms. Benge's injury to persons who had no right or need to have the video and who showed the video to other persons while making appalling comments about Ms. Benge's condition, constituted an intentional and irrational discrimination based on Ms. Benge's past and newly acquired disability.  It humiliated her to peers in her industry who reside at the Residence.

39.  Ms. Benge believes there are other past and current violations of the ADA at Defendants' facility.  Only upon full inspection of Defendants' records, logs, and physical facility can all violations be identified.  A complete list of violations will require examination of records, plans, and an on-site inspection by Ms. Benge's representatives.

40.  Ms. Benge further believes that removal of the discriminatory barriers and violations are readily achievable and technically feasible. Failure to remove such barriers has deterred Ma. Benge from visiting the facility.  To date, the readily achievable barriers and other violations of the ADA still exist and have not been remedied or altered in such a way as to effectuate compliance with the provisions of the ADA.

### B.  Ms. Benge is Entitled to Injunctive Relief

#### 1.  Defendants are engaged in a continuing violation of the ADA

41.  Ms. Benge is a resident at the W Hotel Residence, and since March 27, 2022, Ms. Benge has continued to ingress and egress the Facility by visiting the W Hotel through the Hallway on numerous occasions where she, and persons similarly situated, have been subjected to Defendants' continued failure to comply with the ADA, failure to have signage, failure to provide equal access to disabled individuals, misrepresentations of accessibility,

and the continued concealment of the handicapped ramp with the heavy black-out curtains.

42. As of the date of filing this complaint in March, 2023, the hallway continues to have no signage, warning, or indications which comply with the ADA. There is no notice to any patron that there is a handicapped access ramp within the Hallway. The public and Ms. Benge have been subject to a continuing discrimination, denial of accommodations, and failure to comply with the mandates of the ADA.

43. Ms. Benge will suffer a future injury as she intends to return and enjoy the goods and services at the Subject Facility within the next weeks and months because she lives there. She has been deterred from visiting the Facility because of continuing violations. The Subject Facility is in close proximity to Ms. Benge's residence and is in an area Ms. Benge has and will continue to frequent and travel through. However, Ms. Benge is impaired or precluded from doing so by the Defendants' failure and refusal to provide people with disabilities with full and equal access to their facility. Ms. Benge continues to suffer from discrimination and injury due to the architectural barriers which are in violation of the ADA.

## 2.  The Court should issue an injunction against architectural barriers

44. Removal of the discriminatory barriers and violations is readily achievable and technically feasible. To date, the readily achievable removal of barriers and other violations of the ADA still exist and have not been remedied or altered in such a way as to effectuate compliance with the provisions of the ADA.

45. Pursuant to section 12188, the Court should grant injunctive relief because unless enjoined Defendants will continue to discriminate against Ms. Benge, and others who are similarly situated, by denying access to, and full and equal enjoyment of goods, services, facilities, privileges, advantages and accommodations at the Subject Facility by failing to remove architectural barriers pursuant to 42 U.S.C. §12182 (b)(2)(A)(iv).

## 3.  The Court should restrain current policies, practices, and procedures

46. Defendants have failed to make reasonable modifications in policies, practices, or procedures to ensure full and equal enjoyment of goods, services, facilities, privileges, advantages and accommodations at Defendants' Facility to Ms. Benge, and similarly

situated individuals.  Unless enjoined by the Court, Defendants will continue to discriminate against Ms. Benge, and others who are similarly situated, by denying access to, and full and equal enjoyment of goods, services, facilities, privileges, advantages and accommodations at the Subject Facility by failing to make reasonable modifications in policies, practices, or procedures pursuant to 42 U.S.C. §12182(b)(2)(A)(ii).

### 4. **The Court should issue injunctive relief to maintain compliance**

47.  Defendants have a long and continuing history of violating the ADA.  Following Ms. Benge's March 27, 2022, injury, Ms. Benge met with and discussed with Defendants' management personnel the concealed handicapped access ramp behind the blackout curtains and informed them that she had no knowledge of the existence of the handicapped access ramp prior to her injury.  Nevertheless, Defendants have continued to conceal the handicapped access ramp with blackout curtains, fail to post signs, fail to notify handicapped individuals of handicapped access, and distribute the video.

48. The Defendants' Facility has architectural barriers which Ms. Benge personally encountered on March 27, 2022, causing extensive injury.  Removal of the discriminatory barriers and violations is readily achievable and technically feasible. To date, the readily achievable barriers and other violations of the ADA still exist and have not been remedied or altered in such a way as to effectuate compliance with the provisions of the ADA.

48. Unless enjoined by the Court, Defendants will continue to discriminate against Ms. Benge, and others who are similarly situated, by denying access to full and equal enjoyment of goods, services, facilities, and accommodations at the Facility, failing to maintain ADA compliance, distributing the video, allowing reversion to noncompliance, and failing to enforce any modifications in policies, practices, or procedures.

### C. **Ms. Benge is Entitled To Declaratory Relief**

50.  An actual controversy now exists between Ms. Benge and Defendants because Defendants' Facility has architectural barriers which Ms. Benge has personally encountered, and has caused her injury and damages.  This controversy further exists because:

(1)  Defendants have failed and refused to make reasonable modifications in

policies, practices, or procedures to ensure full and equal enjoyment of goods, services, facilities, privileges, advantages and accommodations at the Defendants' Facility for Ms. Benge and similarly situated individuals with disabilities;

(2)  Defendants have discriminated against Ms. Benge by failing to have disability signs and warning in compliance with the ADA;

(3)  Defendants have failed and refused to remove architectural barriers and the concealment of the handicapped access ramp pursuant to 42 U.S.C. §12182(b)(2)(A)(iv).

(4)  Defendants have discriminated against Ms. Benge on the basis of disability by the unwarranted distribution of the video.

51. A declaration of the parties' rights and obligations is appropriate at this time because Defendants will continue to discriminate against Ms. Benge, and others similarly situated, by denying access to, and full and equal enjoyment of goods, services, facilities, privileges, advantages and accommodations at the Subject Facility.

## SECOND CLAIM

**(Against All Defendants for Violation of the Fair Housing Act, 42 U.S.C. 3601 et. seq. and Discrimination Based on Disability)**

52. Ms. Benge refers to Paragraphs 1- 25, and paragraphs 27-51, inclusive, and incorporates them in this paragraph.

53.  On March 27, 2022, Ms. Benge was a tenant and resident of the W Hollywood Residence located at 6250 Hollywood Boulevard, Hollywood, California 90028, which has more than 132 single family dwelling units.  The Residence project was jointly managed by each of the Defendants with joint responsible for the ownership, occupancy, repair, maintenance, leasing, supervision, inspection, and real estate transactions for the premises.

54.  At some time before midnight on March 27, 2022, Ms. Benge was walking on her way home and seeking to gain access through the W Hotel lobby to the W Hotel Residences as a disabled and handicapped person living in the W Hotel Residence.  Ms. Benge experienced discrimination, barriers, misrepresentations of accessibility, and the concealment of handicapped facilities as she attempted to get home from the Oscars after-

party knowing she was disabled.  Defendants permitted Ms. Benge to walk 30-yards into an area where Defendants knew it was dangerous for Ms. Benge to traverse.

55.  Defendants obstructed her ability to get home by creating architectural barriers to access her housing and concealing the handicapped access ramp in the Hallway between the W Hotel lobby and the W Hotel Residences.  Defendants failed to have signs indicating where handicapped access might exist, and Defendants failed to warn Ms. Benge of the known dangers presented by their concealment of the handicapped access ramp.  Defendants violated the FHA, 42 U.S.C. § 3601 *et seq*., by discriminating against Ms. Benge's disability, intentionally concealing the ramp, failing to post signs, failing to warn of the known dangers presented by the stairway in the Hallway of which Defendants knew presented a disparate impact discrimination and danger to handicapped persons which was the reason the Facility had constructed the handicapped access ramp in the first instance.

56  The FHA prohibits discrimination by direct providers of housing, such as landlords, real estate managers, and other entities, including homeowner associations, engaged in real estate transactions whose discriminatory practices make housing unavailable to persons because of disability. *Id*. § 3605.  The FHA prohibits discrimination on the basis of disability and defines persons with a disability to mean those individuals with mental or physical impairments that substantially limit one or more major life activities.  Mental or physical impairment may include conditions such as mobility impairment, alcoholism, chronic fatigue, and head injury.  The term major life activity includes walking, performing manual tasks, caring for one's self, or working. The FHA also protects persons who have a record of such impairment or are regarded as having such impairment.  *Id*. § 3602(h)

57.  The FHA defines discrimination in housing against persons with disabilities to include a failure "to design and construct" certain new multi-family dwellings so that they are accessible to and usable by persons with disabilities and particularly people who use wheelchairs.  *Id*. § 3604(f)(3).  The Act requires all newly constructed multi-family dwellings of four or more units intended for first occupancy after March 13, 1991, to have certain features: an accessible entrance on an accessible route, accessible common and

public use areas, doors sufficiently wide to accommodate wheelchairs, accessible routes into and through each dwelling, light switches, electrical outlets, and thermostats in accessible location, reinforcements in bathroom walls to accommodate grab bar installations, and usable kitchens and bathrooms configured for wheelchairs.  *Id.* § 3604(f)(3)(c).

58.  On March 27, 2022, the Hallway between the W Hotel lobby and W Hotel Residence was not accessible by disabled persons because of known barriers preventing handicapped persons from safely utilizing the Hallway.  Ms. Benge was attempting go home from a celebration to which Defendants had invited her as a guest and patron, and Defendants knew Ms. Benge could not safely access her home from the event due to the concealment, barriers, and inaccessible handicapped access ramp which Defendants had intentionally concealed with a heavy blackout curtain which prevented Ms. Benge from knowing of the ramp.  Defendants acted as the owner, agent, manager, lessor, and supervisor of the premises in failing to warn Ms. Benge, engaging in discrimination against her, concealing the handicapped access ramp from Ms. Benge and persons similarly situated, and distributing the video as part of the discrimination against her.

59.  The FHA permits Ms. Benge, as an aggrieve person who experienced discrimination based on disability and barriers to her access to her home, to bring a civil suit to obtain relief from the discrimination.  *Id.* § 4613(a)(1)(A).  Ms. Benge may bring civil proceedings "whether or not a complaint has been filed under section 810(a)" of the FHA. *Id* § 3613(a)(2).  Ms. Benge is entitled to injunctive, declaratory, compensatory and punitive damages relief, along with the award of attorney's fees to the prevailing party.  *Id.* § 3613.

60. As a proximate result of Defendants conduct, Ms. Benge has been injured in an amount not presently ascertained.  Ms. Benge's suffered and continues to suffer permanent physical injuries, disfigurement, scars, medical costs and expenses, loss of income and earning capacity, loss of enjoyment of life, physical and mental pain, suffering, emotional distress, exacerbation of her prior physical and mental injuries, and other damages not presently ascertained.  At such time as Ms. Benge has ascertained such damages, she will amend this Complaint to include such damages.

61. As a further proximate result of Defendants' conduct, which was willful, intentional, and deliberate, Ms. Benge is entitled to punitive damages as proved at trial.

62. As a further proximate result of Defendant's conduct, Ms. Benge is entitled to the injunctive and declaratory relief which is set forth in this Complaint.

## THIRD CLAIM

**(Against all Defendants for Violation of the Unruh Civil Rights Act
California Civil Code § 51, et seq., and the Disabled Persons Act
(Cal. Civ. Code §§ 54 & 54.1 *et seq.*)**

63. Ms. Benge refers to Paragraphs 1- 25, paragraphs 27-51, and paragraphs 53-62, inclusive, and incorporates them in this paragraph.

64. The Unruh Civil Rights Act requires people with disabilities be provided equal access to the accommodations, advantages, facilities, privileges, and services of all business establishments of any kind.  California Civil Code §§ 51, *et seq*.  Further, "[a] violation of the right of any individual under the Americans with Disabilities Act of 1990 (Public Law 101-336) … also constitute[s] a violation of [the Act]." Cal. Civ. Code § 51(f).

65. Ms. Benge is a person with disabilities under California Government Code § 12926 and California Civil Code § 51, *et seq*.  Defendants are a business establishment as that term is used in California Civil Code § 51(b), in the administration, development, repair, maintenance, and control of the W Hotel facility, which is an accommodation, advantage, facility, privilege, and service of Defendants in California.

66. Defendants violated the Unruh Civil Rights Act by denying Ms. Benge full and equal access, accommodations, advantages, facilities, privileges, and services to the W Hotel as alleged throughout this Complaint.  Defendants' misrepresentations, concealment, failure to warn, and material failure to comply with ADA standards was a violation of the Act.  Defendants violated the Act by the unwarranted distribution of the video.

67. Defendants knew Ms. Benge was disabled.  Ms. Benge had provided Defendants' management with copies of doctor's letters and statements which show she was disabled as a condition of being a resident in the W Hotel Residence.  Defendants knew they had misrepresented and concealed the handicapped access ramp in the Hallways, knew the effect

their conduct was having on physically disabled persons, and distributed the video of Ms. Benge's injuries to cause her further discrimination.  Defendants nevertheless discriminated against Ms. Benge and other persons similarly situated on the basis she was physically disabled in violation of Civil Code sections 51 *et seq.,* 54, and 54.1 *et seq.*

## FOURTH CLAIM

### (Against All Defendants for Premises Liability and Negligence)

68.  Ms. Benge refers to Paragraphs 1- 25, paragraphs 27-40 paragraphs 53-60, and paragraphs 64-67, inclusive, and incorporates them in this paragraph.

69.  Defendants had an affirmative duty to exercise ordinary care to keep the premises in a reasonably safe condition for Ms. Benge.  Defendants had the responsibility to inspect the facility, ascertain dangerous conditions, and correct or repair known dangers to maintain the property in safe condition.  Defendants owned, leased, and operated the W Hotel and Residence as an inn keeper, and Defendant owners and managers had a duty of care to warn guests and invitees of lurking dangers that may not be open and obvious.

70.  A dangerous and defective condition existed on the premises which was known to Defendants, but was unknown to patrons and residents who Defendants invited on to the premises.  The condition of the Hallway constituted a dangerous and defective condition and unreasonable risk of harm because of the unreasonable darkness of the hallway, failure to replace burned out lights, the uneven stairway steps, the worn and high mat of the carpeting, failure to warn and post signs of the existence of the handicapped access ramp, and the latent defect of the hidden handicapped access ramp.

71.  Defendants knew or should have known of the dangerous and defective condition of the Hallway, and in the exercise of due care would have discovered and known of such condition.  Defendants' knew or should have known of the risk to Ms. Benge because Defendants or their predecessors in interest specifically contracted for the construction of the handicapped access ramp to eliminate a known danger to patrons.  The purpose of the handicapped access ramp created during the construction of the W Hotel was to prevent injuries to disabled individuals, such as Ms. Benge, which were foreseeable.  Defendants

MS. BENGE'S COMPLIANT FOR VIOLATION OF THE ADA, FHA, AND UNRUH ACT

knew the latent defect of the hidden ramp created a foreseeable and dangerous condition on the premises to disabled persons, including Ms. Benge.

72. Defendants breached their duty of due care and were negligent when they:

(a) Negligently failed to keep the property in a reasonably safe condition;

(b) Negligently failed to discover the unsafe conditions and to repair, replace, or give adequate warnings of anything that could reasonably be expected to harm others;

(c) Negligently failed to remove the barrier, concealing curtains, and obstruction to the opening of the handicapped access ramp in the Hallway;

(d) Negligently failed to provide adequate lighting in the Hallway and on the stairs, and failed to replace burned out and non-operative lights in the Hallway;

(e) Negligently permitted persons lawfully on the premises, including Ms. Benge, to use the stairway area when the Defendants knew, or by the exercise of reasonable care should have known, of its dangerous dark and latent defect of the hidden ramp;

(f) Negligently failed to warn Ms. Benge of the dangerous condition in the area, and to post signs, give warnings, or bring to the attention of patrons in the W Hotel that the handicapped access ramp existed for their safety and protection;

(g) Negligently concealed the handicapped access ramp behind blackout curtains where no patron or disabled person such as Ms. Benge could see or know of the existence of the handicapped access ramp,

73. As a proximate and legal result of Defendants' conduct, Ms. Benge fell on the darkened Hallway while using the stairs on March 27, 2022, when the heel of her shoe caught on the matted and worn carpeting on the uneven stairway, causing her to fall and resulting in significant personal injuries, broken bones, and pain, suffering, and emotional distress. Ms. Benge could not and did not know of the dangerous and defective condition of the Hallway. Defendants are liable to Ms. Benge for the injuries she sustained on the property as a result of Defendants' failure to use due care as to the condition of the Hallway and concealment of the handicapped access ramp.

WHEREFORE, Plaintiff, Ms. Wendy Benge, prays for judgment against Defendants

1 W Hotel Hollywood Management, Inc.; Hollywood Hotel OpCo, LLC.; ACORE Capital

2 Mortgage, LP; Hollywood &Vine Residence Association; and Does 1 through 10, and each

3 of them as follows:

4     A. On the First Claim for Violation of the Americans with Disabilities Act, for

5 injunctive and declaratory relief as requested in this Complaint, for civil penalties pursuant

6 to 42 U.S.C §12188(b)(2)(C)(I); 28 C.F.R. § 85.5; and 28 C.F.R. § 36.504(a)(3)(I), and for

7 attorney's fees as provided in 42 U.S.C. § 12205;

8     B. On the Second Claim for Violation the Fair Housing Act, for compensatory and

9 punitive damages in an amount to be proved at time of trial;

10     C. On the Third Claim for Violation of the Unruh Civil Rights Act for civil penalties,

11 compensatory and punitive damages to be proved at trial, and that the damages be trebled;

12     D. On the Fourth Claim for Premises Liability and Negligence for compensatory

13 damages in an amount to be proved at time of trial;

14     E. For a reasonable attorney's fee as provided by law;

15     F. For costs of suit incurred in this action;

16     G. For such further relief the Court deems appropriate.

17 DATED: March 15, 2023            MAUREEN JAROSCAK

18                                  By: _____
19                                  Maureen Jaroscak
                                    Attorney for Plaintiff, Ms. Wendy Benge
20

21 Ms. Benge demands a jury trial.

22 DATED: March 15, 2023            MAUREEN JAROSCAK

23                                  By: _____
24                                  Maureen Jaroscak
                                    Attorney for Plaintiff, Ms. Wendy Benge
25

26

27

28

Exhibit "A"



## FAIR HOUSING & DISCRIMINATION ADVISORY
(C.A.R. Form FHDA, 10/20)

1. **EQUAL ACCESS TO HOUSING FOR ALL:** All housing in California is available to all persons. Discrimination as noted below is prohibited by law. Resources are available for those who have experienced unequal treatment under the law.

2. **FEDERAL AND STATE LAWS PROHIBIT DISCRIMINATION AGAINST IDENTIFIED PROTECTED CLASSES:**
   A. FEDERAL FAIR HOUSING ACT ("FHA") Title VIII of the Civil Rights Act; 42 U.S.C. §§ 3601-3619; Prohibits discrimination in sales, rental or financing of residential housing against persons in protected classes;
   B. CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT ("FEHA") California Government Code ("GC") §§12900-12996,12955; 2 California Code of Regulations ("CCR") §§12005-12271; Prohibits discrimination in sales, rental or financing of housing opportunity against persons in protected classes by providers of housing accommodation and financial assistance services as related to housing;
   C. CALIFORNIA UNRUH CIVIL RIGHTS ACT ("Unruh") California Civil Code ("CC") §51; Prohibits business establishments from discriminating against, and requires full and equal accommodation, advantages, facilities, privileges, and services to persons in protected classes;
   D. AMERICANS WITH DISABILITIES ACT ("ADA") 42 U.S.C. §§12181-12189; Title III of the ADA prohibits discrimination based on disability in public accommodations; and
   E. OTHER FAIR HOUSING LAWS: Section 504 of Rehabilitation Act of 1973 29 U.S.C. §794; Ralph Civil Rights Act CC §51.7.; California Disabled Persons Act; CC §§54-55.32; any local city or county fair housing ordinances, as applicable.

3. **POTENTIAL LEGAL REMEDIES FOR UNLAWFUL DISCRIMINATION:** Violations of fair housing laws may result in monetary civil fines, injunctive relief, compensatory and/or punitive damages, and attorney fees and costs.

4. **PROTECTED CLASSES/CHARACTERISTICS:** Whether specified in Federal or State law or both, discrimination against persons if based on that person's belonging to, association with, or perceived membership to, any of the following classes or categories is prohibited.

| Race | Color | Ancestry | National Origin | Religion |
|---|---|---|---|---|
| Sex | Sexual Orientation | Gender | Gender Identity | Gender Expression |
| Marital Status | Familial Status (family with a child or children under 18) | Source of Income (e.g., Section 8 Voucher) | Disability (Mental & Physical) | Medical Condition |
| Citizenship | Primary Language | Immigration Status | Military/Veteran Status | Age |
| Criminal History (non-relevant convictions) | | | Any arbitrary characteristic | |

5. **THE CALIFORNIA DEPARTMENT OF REAL ESTATE REQUIRES TRAINING AND SUPERVISION TO PREVENT HOUSING DISCRIMINATION BY REAL ESTATE LICENSEES:**
   A. California Business & Professions Code ("B&PC") §10170.5(a)(4) requires 3 hours of training on fair housing for DRE license renewal; Real Estate Regulation §2725(f) requires brokers who oversee salespersons to be familiar with the requirements of federal and state laws relating to the prohibition of discrimination.
   B. Violation of DRE regulations or real estate laws against housing discrimination by a real estate licensee may result in the loss or suspension of the licensee's real estate license. B&PC §10177(l)(1); 10 CCR §2780

6. **REALTOR® ORGANIZATIONS PROHIBIT DISCRIMINATION:** NAR Code of Ethics Article 10 prohibits discrimination in employment practices or in rendering real estate license services against any person because of race, color, religion, sex, handicap, familial status, national origin, sexual orientation, or gender identity by REALTORS®.

7. **WHO IS REQUIRED TO COMPLY WITH FAIR HOUSING LAWS?**
   Below is a non-exclusive list of providers of housing accommodations or financial assistance services as related to housing who are most likely to be encountered in a housing transaction and who must comply with fair housing laws.
   - Sellers
   - Real estate licensees
   - Mobilehome parks
   - Insurance companies
   - Landlords
   - Real estate brokerage firms
   - Homeowners Associations ("HOAs");
   - Government housing services
   - Sublessors
   - Property managers
   - Banks and Mortgage lenders

8. **EXAMPLES OF CONDUCT THAT MAY NOT BE MOTIVATED BY DISCRIMINATORY INTENT BUT COULD HAVE A DISCRIMINATORY EFFECT:**
   A. Prior to acceptance of an offer, asking for or offering buyer personal information or letters from the buyer, especially with photos. Those types of documents may inadvertently reveal, or be perceived as revealing, protected status information thereby increasing the risk of **(i)** actual or unconscious bias, and **(ii)** potential legal claims against sellers and others by prospective buyers whose offers were rejected.
   B. Refusing to rent **(i)** an upper level unit to an elderly tenant out of concern for the tenant's ability to navigate stairs or **(ii)** a house with a pool to a person with young children out of concern for the children's safety.

9. **EXAMPLES OF UNLAWFUL OR IMPROPER CONDUCT BASED ON A PROTECTED CLASS OR CHARACTERISTIC:**
   A. Refusing to negotiate for a sale, rental or financing or otherwise make a housing opportunity unavailable; failing to present offers due to a person's protected status;
   B. Refusing or failing to show, rent, sell or finance housing; "channeling" or "steering" a prospective buyer or tenant to or away from a particular area due to that person's protected status or because of the racial, religious or ethnic composition of the neighborhood;
   C. "Blockbusting" or causing "panic selling" by inducing a listing, sale or rental based on the grounds of loss of value of property, increase in crime, or decline in school quality due to the entry or prospective entry of people in protected categories into the neighborhood;
   D. Making any statement or advertisement that indicates any preference, limitation, or discrimination;

© 2020, California Association of REALTORS®, Inc.
**FHDA 10/20 (PAGE 1 OF 2)**

### FAIR HOUSING & DISCRIMINATION ADVISORY (FHDA PAGE 1 OF 2)

E. Inquiring about protected characteristics (such as asking tenant applicants if they are married, or prospective purchasers if they have children or are planning to start a family);

F. Using criminal history information before otherwise affirming eligibility, and without a legally sufficient justification;

G. Failing to assess financial standards based on the portion of the income responsible by a tenant who receives government subsidies (such as basing an otherwise neutral rent to income ratio on the whole rent rather than just the part of rent that is the tenant's responsibility);

H. Denying a home loan or homeowner's insurance;

I. Offering inferior terms, conditions, privileges, facilities or services;

J. Using different qualification criteria or procedures for sale or rental of housing such as income standards, application requirements, application fees, credit analyses, sale or rental approval procedures or other requirements;

K. Harassing a person;

L. Taking an adverse action based on protected characteristics;

M. Refusing to permit a reasonable modification to the premises, as requested by a person with a disability (such as refusing to allow a wheel chair bound tenant to install, at their expense, a ramp over front or rear steps, or refusing to allow a physically disabled tenant from installing, at their own expense, grab bars in a shower or bathtub);

N. Refusing to make reasonable accommodation in policies, rules, practices, or services for a person with a disability (such as the following, if an actual or prospective tenant with a disability has a service animal or support animal):
  (i)   Failing to allow that person to keep the service animal or emotional support animal in rental property,
  (ii)  Charging that person higher rent or increased security deposit, or
  (iii) Failing to show rental or sale property to that person who is accompanied by the service animal or support animal, and;

O. Retaliating for asserting rights under fair housing laws.

**10. EXAMPLES OF POSITIVE PRACTICES:**

A. Real estate licensees working with buyers or tenants should apply the same objective property selection criteria, such as location/neighborhood, property features, and price range and other considerations, to all prospects.

B. Real estate licensees should provide complete and objective information to all clients based on the client's selection criteria.

C. Real estate licensees should provide the same professional courtesy in responding to inquiries, sharing of information and offers of assistance to all clients and prospects.

D. Housing providers should not make any statement or advertisement that directly or indirectly implies preference, limitation, or discrimination regarding any protected characteristic (such as "no children" or "English-speakers only").

E. Housing providers should use a selection process relying on objective information about a prospective buyer's offer or tenant's application and not seek any information that may disclose any protected characteristics (such as using a summary document, e.g. C.A.R. Form SUM-MO, to compare multiple offers on objective terms).

**11. FAIR HOUSING RESOURCES:** If you have questions about your obligations or rights under the Fair Housing laws, or you think you have been discriminated against, you may want to contact one or more of the sources listed below to discuss what you can do about it, and whether the resource is able to assist you.

A. Federal: **https://www.hud.gov/program_offices/fair_housing_equal_opp**

B. State: **https://www.dfeh.ca.gov/housing/**

C. Local: local Fair Housing Council office (non-profit, free service)

D. DRE: **https://www.dre.ca.gov/Consumers/FileComplaint.html**

E. Local Association of REALTORS®. List available at: **https://www.car.org/en/contactus/rosters/localassociationroster**

F. Any qualified California fair housing attorney, or if applicable, landlord-tenant attorney.

**12. LIMITED EXCEPTIONS TO FAIR HOUSING REQUIREMENTS: No person should rely on any exception below without first seeking legal advice about whether the exception applies to their situation. Real estate licensees are not qualified to provide advice on the application of these exceptions.**

A. Legally compliant senior housing is exempt from FHA, FEHA and Unruh as related to age or familial status only;

B. An owner of a single-family residence who resides at the property with one lodger may be exempt from FEHA for rental purposes, PROVIDED **no real estate licensee is involved** in the rental;

C. An owner of a single-family residence may be exempt from FHA for sale or rental purposes, PROVIDED **(i) no real estate licensee is involved** in the sale or rental and **(ii)** no discriminatory advertising is used, and **(iii)** the owner owns no more than three single-family residences. Other restrictions apply;

D. An owner of residential property with one to four units who resides at the property, may be exempt from FHA for rental purposes, PROVIDED **no real estate licensee is involved** in the rental; and

E. Both FHA and FEHA do not apply to roommate situations. See, *Fair Housing Council v Roommate.com LLC*, 666 F.3d 1216 (2019).

F. Since both the 14th Amendment of the U.S. Constitution and the Civil Rights Act of 1866 prohibit discrimination based on race; the FHA and FEHA exemptions do not extend to discrimination based on race.

Buyer/Tenant and Seller/Landlord have read, understand and acknowledge receipt of a copy of this Fair Housing & Discrimination Advisory.

Buyer/Tenant _____   *Wendy M Benge* Date _____

Buyer/Tenant _____ Date _____

Seller/Landlord _____   *Dominick Tousignant* Date _____

Seller/Landlord _____ Date _____

© 2020, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats. THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS®. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL. This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, LLC.
*a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®*
525 South Virgil Avenue, Los Angeles, California 90020

**FHDA 10/20 (PAGE 2 OF 2)**

**FAIR HOUSING & DISCRIMINATION ADVISORY (FHDA PAGE 2 OF 2)**

Produced with Lone Wolf Transactions (zipForm Edition) 231 Shearson Cr. Cambridge, Ontario, Canada N1T 1J5 www.lwolf.com        6250 Hollywood

Exhibit "B"



🌐 US & CANADA

# W Hotels

## overview & project administration

global**design**strategies
# design**standards**
October 2022  |  franchised

- NFPA 101 Life Safety Code (US)
- ANSI Standards
- UL and ASTM Standards
- Current ADA Standards for Accessibility Design  https://www.ada.gov

4. Code Integration: Follow these Design Standards when they exceed requirements of governing codes or accessibility guidelines.

5. Refer conflicts with Design Standards to the MI project team for resolution.

GR1.6  Accessibility

A. Meeting the Needs of All Guests: In keeping with the best traditions of Marriott's hospitality, we extend hotel services to all guests, including those with disabilities.

1. We work diligently to apply the best current thinking on accessibility features to each new hotel, and each hotel renovation.

2. Recognizing that we operate and acquire hotels originally built under previous requirements, we constantly seek to improve the physical accessibility of our hotels, removing existing barriers wherever feasible, as well as extending services where barriers remain.

B. Accessibility Standards Compliance: If governing accessibility standards do not exist, comply with the criteria as outlined by the U.S. ADA Standards for Accessible Design. At the minimum, comply with accessibility regulations of the country where the project is located and the following required criteria for persons with disabilities:

1. Building Access: Provide an accessible public path of travel into the building and into spaces accessible to guests.

2. Service: Provide access to services generally available to property guests.

3. Public Toilets: Public area restrooms have accessible toilet compartments, urinals, and lavatories.

4. **R** ADA Reference: Internet site at: http://www.ada.gov

C. Conflicts: In cases where the governing accessibility laws conflict or are not mutually addressed, consult with MI to develop a program that accommodates the guest's expectations.

D. Accessibility Design Compliance:

October 2022  marriott international. all rights reserved.                    W Hotels - USCA

1. Building Access and Route:

   a. Provide an accessible route for persons with disabilities to Building Entry Areas to comply with all applicable accessibility regulations.

   b. Public Entrances: Design 60% of public entrances, with at least one ground floor entrance and one pedestrian entrance from a parking structure for access by persons with disabilities.

   c. Doorways: At exterior and interior doorways, provide an 82 cm (32 inch) minimum clear opening with approach and strike side clearance. Typically, provide 46 cm (18 inch) minimum clear at the strike side to adjacent wall for an in-swinging door.

   d. Provide accessible check-in accommodations in compliance with governing accessibility regulations and coordinated with the Hotel Brand Design.

2. Signage: Comply with governing regulations for signage and graphics specifications. Follow signage specifications including the intent of the Americans with Disabilities Act (ADA) Accessibility Guidelines unless superseded by local governing regulations. Implement required and customized signage such as Braille if usage is prevalent in the region.

3. Recreation and Fitness:

   a. Locate recreation facilities and guest amenities along accessible routes. Design facilities for access by guests with disabilities.

   b. Where a boardwalk or similar beach access is provided, no less than one route is accessible for guests with disabilities.

   c. Swimming Pools: Provide a permanent transfer lift at each pool and whirl pool or other accommodation as required by governing regulation.

4. Accessible Guestrooms: Design room layout for use by guests with disabilities.

   a. Standard: Current version of the ADA Standards for Accessibility Design (https://www.ada.gov)

   b. Quantities: Provide Accessible guestroom quantities as required by the accessibility standards noted above.

   c. Hearing Impaired: Accommodate persons with hearing impairments as required by the accessibility standard noted above.
      • Provide doorbell strobe / chime (flush style) as required with an on / off switch inside room.
      • Telephones with volume control handsets and text telephones as

required by governing accessibility regulations are available at the front desk.

d. Incorporate the same Brand design requirements as in standard Guestrooms.  Provide accessories equal to standard Guestrooms and elevated design aesthetics.

• Accessories shall include but are not limited to grab bars, showering and bathing plumbing fixtures, shower and tub seats, accessible closet rod.

e. Bed Requirements:

• Install bed with an overall height of 56 cm (22 inch) with an allowable range of 53 cm to 58 cm (21 to 23 inch) from finished floor to top of uncompressed mattress, unless otherwise dictated by applicable State or local laws.

• Provide 18 cm (7 inch) high clearance under long side of bed with a 76 cm (30 inch) minimum depth and 91 cm (36 inch) minimum width to accommodate a Hoyer or similar person lift unless otherwise dictated by applicable State or local laws.

• On platform frames provide appropriate support for mattress where clear opening for lift occurs.

f. Connect accessible guestrooms (ADA rooms) to a standard guestroom.

g. Door Hardware to match hardware designed for standard guestrooms.

h. Viewer: Furnish two at accessible rooms; install lower viewer at 1.0 to 1.6 m (40 to 42 inch) above finish floor.

i. Guest Bathroom: At accessible roll-in showers, provide a secondary floor drain outside the shower area.

October 2022  marriott international. all rights reserved.                    W Hotels - USCA

Exhibit "C"



**Dr. Michael F. Sedrak**

Inland Empire Minimally Invasive Surgery
1902 Fullerton Ave, Suite 101, Corona, CA 92881
Email: mike_sedrsk@sbcglobal.net
Tel: 818-296-0526 Fax# 818 446-9897
Tax ID: 81-1086961/NPI: 1083070494

May 5, 2021

TO: Airlines, MIQ, and Immigration:

RE: SERVICE DOG

Dear Sir or Madam:

Ms. Benge has been a patient under my care since 2013. Ms. Benge is a 70% disabled veteran with underlying medical conditions. I am intimately familiar with her medical history and the functional limitations imposed by her disabilities and related disorders. I am requesting and recommending that that Ms. Benge receive the medical benefits for her disability and by the ownership of her Service Dog Bijou dela Hound.

Ms. Benge meets the definition of disability under the Americans with Disabilities Act, Fair Housing Act and the Rehabilitation Act of 1973 by the continued suffering of petit-mal epilepsy, absent seizures, head trauma and PTSD among other ailments consisting of asthma, scarred lungs and anxiety.

Due to symptoms associated with her disability/disorder Ms. Benge has certain limitations that substantially limit one or more major life activities. This includes physiological and psychological disturbances of which having a service dog, around the clock, including housing and her work environment, greatly benefits her life and are a medical necessity.

In order to help alleviate or mitigate these difficulties and to enhance her living and work environment I have approved and recommended a service animal to assist in her disabilities. Ms. Benge's Service Dog has been trained under the supervision of expert dog trainers at Canyon View Ranch in Topanga, CA and meets the requirement of ADI as a certified Service Dog.

Bijou has been trained perform medically necessary tasks to stay with her handler at all times during her episodes/seizures, to provide notice of such episodes to others during such debilitating episodes, along with alleviating stress that could develop into asthma or panic attacks that stem from her disabilities.

Per the law above and due to the medical necessity deriving from such conditions please allow Ms. Benge to be accompanied by her trained service dog Bijou, a 20 pound, beagle mix in the cabin of its airline in accordance with Air Carrier Access Act (49 U.S.C. 41705 and 14 C.F.R. 382). I further make an appeal to allow Ms. Benge to be accompanied by her Service Dog through any quarantine or any holdings of more than 5 hours.

Sincerely,

*Michael Sedrak*

Dr. Michael F. Sedrak M.D

Exhibit "D"



# Exhibit "E"

